UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



AMANDA L. COOLEY,

Plaintiff,

v.

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

Defendant.

**DECISION AND ORDER**

6:16-CV-06301-EAW

## INTRODUCTION

Represented by counsel, Plaintiff Amanda L. Cooley ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (Dkt. 1). Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. 9; Dkt. 14). For the reasons set forth below, the Commissioner's motion is denied, Plaintiff's motion is granted in part, and this matter is remanded for further administrative proceedings.

---

[1]    Nancy A. Berryhill been substituted as the defendant in this action pursuant to Federal Rule of Civil Procedure 25(d).

## I.    Factual Background and Procedural History

### A.    Overview

On October 12, 2012, Plaintiff filed an application for DIB.  (*See* Administrative Transcript (hereinafter "Tr.") at 161-66).  On October 30, 2012, she applied for SSI.  (Tr. 167-72).  Plaintiff alleges that she has been disabled since February 21, 2012, due to anxiety and depression.  (Tr. 167, 185).  Plaintiff's application was initially denied on January 15, 2013.  (Tr. 98).  Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ") on February 15, 2013.  (*See* Tr. 106-07).  Plaintiff appeared at a hearing before ALJ Mary F. Withum on June 6, 2014.  (*See* Tr. 44).  Vocational Expert ("VE") Dana Leslie also testified at the hearing.  (Tr. 45).  On August 27, 2014, ALJ Withum issued a decision finding Plaintiff not disabled.  (Tr. 21-36).  The Appeals Council denied Plaintiff's request for review on March 21, 2016, rendering the ALJ's decision the final decision of the Commissioner.  (*See* Tr. 5).  Plaintiff commenced this action on May 16, 2016.  (Dkt. 1).

### B.    The Non-Medical Evidence

#### 1.    Plaintiff's Testimony

At the hearing before ALJ Withum, Plaintiff testified that she was living by herself and not currently working.  (Tr. 49).  Plaintiff had medical coverage, and was receiving food stamps as well as temporary assistance.  (*Id.*).  Plaintiff stated that she had a car, which she drove "infrequently" to go to the doctor and grocery store.  (*Id.*).

The ALJ questioned Plaintiff about her past work experience.  (Tr. 50).  Plaintiff testified that she had completed some college.  (*Id.*).  She had previously worked full-

time behind the receptionist desk in the emergency room, at a retail kitchen supply store, and at an office in a mental health hospital. (Tr. 50-52). Plaintiff also worked at a car dealership where she was in charge of accounts payable/receivable. (Tr. 52).

When asked by the ALJ why Plaintiff was unable to return to work full-time, Plaintiff replied, "I'm unable to function on a daily basis." (Tr. 53-54). Specifically, Plaintiff stated she had "no concentration," was "upset all the time, [and] anxious all the time." (Tr. 54). Plaintiff testified that she stopped working at the car dealership as a result of anxiety and depression. (*Id.*).

The ALJ questioned Plaintiff about her medical history. Plaintiff stated that she was currently seeing Pam King, a Psychiatric Nurse Practitioner. (Tr. 55). Plaintiff stated that she sees Pam King every three to four weeks and that she had recently started seeing a therapist. (Tr. 57). Plaintiff testified that since February 21, 2012, she has had one inpatient psychiatric stay of five days as a result of Plaintiff overdosing on her medication. (Tr. 55-56). She also noted "a couple of nights of observation in emergency rooms." (Tr. 55). In response to a question about the emergency room visits, Plaintiff stated that she took her medication "to escape the anxiety and the depression and the sadness." (Tr. 57-58).

The ALJ inquired as to why Plaintiff began experiencing her reported mental health issues in 2012. (Tr. 58). Plaintiff noted that her stress had increased over the past few years and that she had intermittent mental health medications since 2001. (*Id.*). In addition, Plaintiff testified that she was the victim of a sexual assault in March of 2012, which she characterized as a traumatic event over which she frequently obsesses. (*Id.*).

- 3 -

Plaintiff testified that she experiences panic attacks "[f]ive to six days a week, almost daily," and that the attacks last two to three hours. (Tr. 59). Plaintiff's medication for the panic attacks had been taken away from her because of overdosing. (*Id.*). Plaintiff explained that during the attacks her chest beats fast affecting her breathing, and that she would have to lay down in silence to calm herself. (*Id.*).

Plaintiff stated that she experienced migraines, on average, three to five times a week. (*Id.*). Plaintiff testified to taking two different medications for her migraines approximately three times a week. (Tr. 59-60). The medication reduced, but did not eliminate, her pain. (Tr. 60). Plaintiff reported an average pain level of seven out of ten, and that after taking her medication the pain drops to five or six. (*Id.*). The medication took a couple hours to kick in. (*Id.*). Plaintiff began taking medication when she was fifteen years old, but her migraines increased in severity in 2006. (*Id.*).

Plaintiff testified that she used a preventative inhaler to control her asthma. (Tr. 61). The inhaler worked "for the most part," but its effectiveness varied based on seasonal allergies and humidity. (*Id.*).

ALJ Withum then asked Plaintiff to describe her activities during a typical day. (*Id.*). Plaintiff stated that a successful day would consist of sitting down and watching a morning program, sometimes flipping through a magazine, or calling one of her few friends. (*Id.*). Plaintiff then stated that on most days, five days a week, her day was "one big cycle of nothingness." (*Id.*). Plaintiff further testified that she does not cook and rarely does laundry. (Tr. 61-62). Plaintiff stated she lost about forty pounds in the past year, yet she is unable to exercise because of a knee injury. (Tr. 62).

- 4 -

The ALJ questioned Plaintiff about her knee. Plaintiff noted that the pain level in her knee can go up to a ten out of ten, and that it can keep her up at night to the point she cannot sleep. (*Id.*). Plaintiff had three arthroscopic surgeries on her knee. (Tr. 62-63). Plaintiff did physical therapy exercises on her own after the surgeries. (Tr. 63).

The ALJ also asked about Plaintiff's medications. (Tr. 63-64). Plaintiff said that her medications provided slight improvement in her anxiety, yet she cried frequently and claimed that "everything makes . . . [her] upset," resulting in lack of appetite. (Tr. 64). Plaintiff also stated that her medications can make her feel nauseous and sleepy. (*Id.*). Plaintiff added that her sleep schedule is sporadic, altering based on her levels of nervousness and anxiety. (Tr. 64-65).

ALJ Withum then questioned Plaintiff about her ability to walk and stand. (Tr. 65). Plaintiff testified that she could walk for ten minutes and stand for twenty minutes. (*Id.*). Plaintiff stated her knee pain is too great to stoop or kneel or crouch, and she could comfortably lift fifteen pounds. (*Id.*). Plaintiff could sit for hours at a time. (*Id.*).

Plaintiff was then examined by her attorney. (Tr. 66). Plaintiff testified her grandmother lived with Plaintiff from January 2013 until May 2013. (Tr. 66). The grandmother did the dishes and laundry, cooked, and swept. (*Id.*). Her grandmother was fully mobile until she caught pneumonia and was later admitted to a nursing home. (Tr. 66-67).

### 2. Vocational Expert's Testimony

VE Leslie also testified at the hearing. (Tr. 67-70). The VE reported Plaintiff's past work history and the associated skill and exertional levels for each job. (Tr. 67).

Leslie described Plaintiff's past work as: management trainee (light, SVP of 6); accounting clerk (sedentary, SVP of 5); medical secretary (sedentary, SVP of 6); and a hospital admitting clerk (sedentary, SVP of 4). (*Id.*).

The ALJ then posed hypotheticals to the VE. (Tr. 67-69). In the first hypothetical, the ALJ asked the VE to

> assume that the claimant has the residual functioning capacity to perform at the light exertional level. But no work on ladders, ropes or scaffolds, and no work at unprotected heights. She is limited to occasional kneeling, crouching, and crawling. She should avoid concentrated exposure to environmental irritants and extreme humidity. She should also avoid concentrated exposure to loud noises. She is limited to simple, routine, repetitive tasks with occasional interactions with coworkers, supervisors and the general public.

(Tr. 67-68). The VE stated that the claimant would not be able to perform her past work either as she actually performed the work or as those occupations are generally performed in the national economy. (Tr. 68).

The ALJ then asked the VE if there were jobs in the national economy for a person of the same age, education and work history of the claimant, and assuming the Residual Functional Capacity ("RFC") already given. (*Id.*). The VE stated that such an individual could work as a housekeeper (light, SVP of 2); sorter, agricultural produce (light; SVP of 2); or mail clerk (light, SVP of 2). (*Id.*).

In a third hypothetical, the ALJ asked the VE whether there would are jobs in the national economy if the RFC were reduced from the light exertional level to the sedentary exertional level. (*Id.*). The VE stated that the following occupations could be performed:

charge account clerk (sedentary, SVP of 2); document preparer (sedentary, SVP of 2); and call-out operator (sedentary; SVP of 2). (*Id.*).

In a final hypothetical, the ALJ added a limitation of no interaction with the general public. (*Id.*). The VE responded that if the work was done in person all the occupations were possible, but if the work was done by telephone, only work as a document preparer was consistent with the hypothetical. (Tr. 69).

The VE also testified that an unskilled worker would be terminated if they were absent more than once a month, and could not be off task more than ten percent of the time. (Tr. 69-70).

## C.   Summary of the Medical Evidence

### 1.   Nurse Practitioner Pam King

On August 9, 2012, Psychiatric Nurse Practitioner King began treating Plaintiff for depression and anxiety after Plaintiff was referred by her primary care physician. (Tr. 238). Plaintiff reported her history of illness, current medications, and current anxiety symptoms. (*Id.*). These symptoms included difficulty leaving her home, avoidance of social situations, and panic attacks. (*Id.*). Plaintiff denied suicidal ideation and noted irritability. (*Id.*). After being withdrawn from work in February 2012, Plaintiff could not get out of bed, was more withdrawn, and lost twenty pounds. (*Id.*).

Plaintiff appeared pleasant and cooperative during the session, and maintained good eye contact. (Tr. 239). Her speech was within normal limits, and Plaintiff reported that she felt anxious. (*Id.*). Plaintiff reported her history of depression, avoidant behaviors, and feeling "overwhelmed." (*Id.*). Her thoughts were organized and coherent.

(*Id.*). Plaintiff complained of difficulty with focus and concentration when depressed. (*Id.*). Plaintiff denied any history of hallucinations, and was oriented to person, place, and time. (Tr. 239-240). Her short- and long term memory were intact. (Tr. 240). King diagnosed Plaintiff with major depression recurrent; generalized anxiety disorder; panic disorder without agoraphobia, and migraine headaches. (*Id.*).

King next saw Plaintiff on September 20, 2012. (Tr. 237). King assessed generalized anxiety disorder, major depressive recurrent, and panic disorder without agoraphobia, and increased Plaintiff's Lexapro medication. (*Id.*).

On October 9, 2012, Plaintiff called King and stated that she was "having a hard time" leaving the house and was unable to come into an appointment. (Tr. 236). Plaintiff said she had been in bed for two weeks, missed school, and had not showered for a week. (*Id.*).

King treated Plaintiff the following day. (Tr. 264). King noted that "[Plaintiff] should probably be disabled due to the fact that she is unable to get out of bed early in time for school." (*Id.*). On October 24, 2012, Plaintiff noted no significant improvement with regards to her mood; she remained depressed and anxious, having panic attacks when going out of the house. (Tr. 265). Plaintiff was no longer attending school because she missed too much time. (*Id.*).

On November 21, 2012, Plaintiff again met with King. (Tr. 266). Plaintiff reported some improvement to her mood but continued to be quite depressed. (*Id.*). She stated "her mood tends to be up and down." (*Id.*). King noted that Plaintiff continued to have difficulty functioning with day-to-day activities. (*Id.*). King assessed Generalized

Anxiety Disorder; Panic Disorder without Agoraphobia; Major Depression Recurrent; and Bipolar II Disorder provisional. (*Id.*).

Plaintiff next met with King on December 12, 2012. (Tr. 267). Plaintiff still had difficulty getting out of the house, having episodes of staying in bed all day long with no energy or motivation. (*Id.*). Plaintiff appeared somewhat tense during the session. (*Id.*). Plaintiff's mood continued to be depressed and anxious; she had difficulty performing activities of daily living, and was not able to work. (*Id.*). King assessed: Generalized Anxiety Disorder; Panic Disorder without Agoraphobia; Major Depressive Recurrent. (*Id.*).

On March 20, 2013, King and Psychiatrist Kang Yu, M.D. ("Dr. Yu") evaluated Plaintiff. (Tr. 418-420). Plaintiff reported increased anxiety and symptoms of depression, increased stressors at home, and difficulty sleeping. (Tr. 418). Plaintiff had difficulty leaving her home and had been unable to work a job due to anxiety and mood lability. (*Id.*). Plaintiff appeared neatly groomed. (Tr. 419). Her speech was within normal limits, and she was pleasant and cooperative during the session. (*Id.*). She reported being anxious all the time, and having panic attacks three to four times a week. (*Id.*). She denied any suicidal or homicidal ideation. (*Id.*). Plaintiff's focus and concentration was okay. (*Id.*). Plaintiff was diagnosed with Bipolar II Disorder; Panic Disorder with agoraphobia; Generalized Anxiety Disorder, and her medications were increased. (Tr. 419-20).

King treated Plaintiff again on April 4, 2014. (Tr. 421). Plaintiff reported that overall she was feeling a little better, yet continued to struggle with anxiety. (*Id.*). On

May 14, 2014, King completed a Mental Impairment Questionnaire assessing Plaintiff. (Tr. 446-48). King diagnosed Bipolar II disorder; GAD; Panic Disorder with agoraphobia; and migraines. (Tr. 446). King assessed Plaintiff's functional limitations and found: marked restriction of activities of daily living; extreme difficulties in maintaining social functioning; marked deficiencies in concentration, persistence or pace; and four or more repeated episodes of decompensation within a twelve month period, each of at least two weeks duration. (Tr. 447). King further assessed a "[m]edically documented history of a chronic organic mental, schizophrenic, etc. or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support," and: (1) "[t]hree episodes of decompensation within 12 months, each at least two months long;" and (2) "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (Tr. 448). King anticipated that Plaintiff would likely be absent from work more than four days per month on average due to her impairments or treatment. (*Id.*). King noted that Plaintiff's impairment could be expected to last at least twelve months, and that Plaintiff was not a malingerer. (*Id.*). King also indicated that Plaintiff would have difficulty working a regular job on a sustained basis due to weeks of isolation resulting from her anxiety and pain. (*Id.*).

### 2.  Neurologist William J. Kingston

On January 19, 2012, neurologist Dr. William J. Kingston ("Dr. Kingston") treated Plaintiff for headaches. (Tr. 230). Plaintiff's headaches occurred daily, and about three days per week her headaches worsened to an eight out of ten in severity. (*Id.*). Plaintiff noted moderate to high stress and mild depression. (*Id.*). Upon physical examination, Plaintiff did not appear to be in any significant discomfort. (*Id.*). Dr. Kingston assessed headache, migraine with aura, stress, and that she may have mixed headache syndrome. (Tr. 230-31).

On April 16, 2012, Dr. Kingston saw Plaintiff and noted that she had been taken out of work. (Tr. 228). Her headaches, stress and depression had improved, yet she had continued stress and depression. (*Id.*). On physical examination, Plaintiff was obese and in no apparent discomfort. (*Id.*). Dr. Kingston assessed headaches, migraine with aura; stress; headaches, tension type; and depression. (Tr. 228-29). Dr. Kingston noted that Plaintiff's headaches had improved, and that "[h]opefully she can find another job that is less stressful." (Tr. 229).

On August 22, 2012, Dr. Kingston again treated Plaintiff. (Tr. 226-27). Plaintiff reported headaches as often as three to four times a week, sometimes reaching an eight out of ten in severity. (Tr. 226). Plaintiff noted moderate stress and some depression, but that the depression seemed mild. (*Id.*). Dr. Kingston reported that Plaintiff probably has mixed headache syndrome and some migraine headaches. (Tr. 226-27).

On December 12, 2012, Dr. Kingston treated Plaintiff for reoccurring headaches with a severity of six to seven out of ten. (Tr. 277). Plaintiff noted moderate stress and depression. (*Id.*).

On March 13, 2013, Dr. Kingston once again saw Plaintiff. (Tr. 274). Plaintiff continued to have headaches, and also complained of wrist and neck pain. (*Id.*). She noted moderate depression and severe stress. (*Id.*). Plaintiff had also begun living with her grandmother. (*Id.*).

Dr. Kingston next treated Plaintiff on August 20, 2013. (Tr. 227-73). Plaintiff stated that she continued to get headaches about four days per week, lasting about four hours, and rated at a seven out of ten in severity. (Tr. 272). Plaintiff also noted a high level of stress and depression, but denied suicidal ideation. (*Id.*). Dr. Kingston reported that Plaintiff "again has a mixed headache syndrome," continuing to get frequent headaches. (Tr. 273).

### 3.    Hospital Admissions; Intentional Overdoses

The record includes evidence of Plaintiff's hospital admissions and intentional overdoses. On March 12, 2014, Plaintiff was treated in the emergency room for suicidal ideation. (*See* Tr. 294-312). Plaintiff took approximately eighty "butalbital/ acetaminophen/caffeine tablets" because she "wanted it all to go away." (Tr. 296). Plaintiff reported that she took the medication and fell asleep on the couch. (*Id.*).

From March 13, 2014, until March 17, 2014, Plaintiff was admitted to the psychiatric unit at Clifton Springs Hospital because of her intentional overdose. (*See* Tr. 381-92). Plaintiff had been isolating herself for six months, reporting that she would stay

at home for weeks at a time and not go out unless absolutely necessary. (Tr. 381). Plaintiff claimed to have "crowd anxiety" and cried during the evaluation. (*Id.*). Plaintiff was diagnosed with Depressive disorder NOS; morbid obesity; constant migraines (five per week); and rule out Borderline Personality Disorder. (Tr. 382).

On April 8, 2014, Plaintiff was evaluated in the emergency room following an alleged medical overdose. (*See* Tr. 313-23, 439-44). Plaintiff claimed to have ingested fifty to seventy Fiorocet pills over a course of five hours. (Tr. 317). Plaintiff denied any desire to hurt herself. (*Id.*). Upon departure, Ramiro Ramos, M.D., noted that it was "[u]nclear if . . . [Plaintiff] actually took any medication or is just stating this to get attention. She adamantly denies suicidal ideation or attempt, but can not give a good reason why she took that much Fiorocet." (Tr. 323). Dr. Ramos discharged Plaintiff because, "[a]lthough she shows poor judgement[,] she does not require psychiatric or further medical evaluation." (*Id.*).

On April 10, 2014, Plaintiff was again treated in the hospital following a medical overdose. (Tr. 324-48). Plaintiff's friend called EMS when she found Plaintiff on the floor heavily sedated. (Tr. 336). Plaintiff was groggy, but was not experiencing any pain or discomfort. (*Id.*).

On April 11, 2014, Plaintiff presented at Geneva Hospital complaining of lethargy and fatigue. (Tr. 352-64). Plaintiff's family was concerned about her overdosing on medication. (Tr. 355). Later that day, Plaintiff was treated at Clifton Springs Hospital. (Tr. 368-80). Plaintiff reported falling off her bed because she took too much medication, and complained of feeling "groggy." (Tr. 368). Plaintiff's friend assisted

Plaintiff off the floor after she defecated and was unable to get up on her own. (Tr. 371). Plaintiff's friend shared that Plaintiff tends to fabricate stories often and will do things to get attention. (*Id.*). On mental status examination, Plaintiff's speech was slurred, slow, and mumbled. (Tr. 373). Intelligence was average, insight was poor, and judgement was impulsive and impaired with increased emotion. (Tr. 374).

On June 2, 2014, Plaintiff was treated in the emergency room following an overdose of medications. (*See* Tr. 457-69). Plaintiff stated that she ingested over ninety Knolopin and ten Xanax pills because she wanted to feel better. (Tr. 457). Plaintiff was lethargic, but had no motor/sensory deficits upon physical examination. (Tr. 458). One doctor stated, "[i]t seems unlikely that the patient took high amounts of Klonopin and Xanax, but instead I am suspecting a cry for help as opposed to an actual suicide attempt." (Tr. 467).

### 4.   Doctor Joseph Lorenzetti

On February 22, 2012, Joseph Lorenzetti, M.D. ("Dr. Lorenzetti") treated Plaintiff for anxiety and depression. (Tr. 437). Plaintiff complained of feeling depressed and anxious. (*Id.*). Dr. Lorenzetti noted suicidal thoughts and a lack of sleep, and altered Plaintiff's medications. (*Id.*). Plaintiff next met with Dr. Lorenzetti on March 2, 2012. (Tr. 436). Plaintiff was "still very anxious," depressed, and had spent more than twenty-four hours in bed. (*Id.*). Additional medication was prescribed. (*Id.*). On March 14, 2012, Plaintiff was feeling a little better, however she was still very anxious. (Tr. 435). Dr. Lorenzetti noted that Plaintiff exhibited depression and suicidal thoughts. (*Id.*). Plaintiff's medication was increased. (*Id.*). On April 11, 2012, Plaintiff reported that her

medication was helping, but that she was still very anxious. (Tr. 434). Plaintiff was stressed out because of her co-workers and perceived work as a hostile environment. (*Id.*). Dr. Lorenzetti took Plaintiff out of work until she could be further evaluated. (*Id.*).

### 5. Psychiatric Social Worker Steven Kane

On February 28, 2013, Plaintiff began treatment with Steven Kane ("Kane"), a Licensed Clinical Social Worker at Seneca County Community Counseling Center. (Tr. 416-417). Plaintiff reported anxiety in the form of panic attacks 3-4 times per week, fear of crowds, nausea and vomiting. (Tr. 416). Plaintiff reported isolating herself and being "anxious all the time." (*Id.*). Additionally, she reported depressed mood, hypersomnia, and occasional suicidal thoughts. (*Id.*). Plaintiff appeared neatly groomed, somewhat obese, pleasant and cooperative. (Tr. 417). Speech was normal in rate, tone and inflection, and her thoughts were organized and coherent, and no perceptual disturbance was evident. (*Id.*). Plaintiff denied suicidal ideation, plan or intent. (*Id.*). Kane's preliminary diagnoses were Panic Disorder with agoraphobia; Generalized Anxiety Disorder; Depressive Disorder; R/O Bipolar II Disorder; and R/O PTSD. (*Id.*).

### D. State Agency Opinions

### 1. Psychologist Christine Ransom

Psychologist Christine Ransom, Ph.D., ("Dr. Ransom") a State agency consultant, performed an adult psychiatric evaluation on Plaintiff on December 19, 2012. (*See* Tr. 259-62). Dr. Ransom noted Plaintiff's background information, psychiatric history, current medications, and current functioning. (Tr. 259-260).

Plaintiff was cooperative and socially appropriate. (Tr. 260). Her dress was neat, casual and appropriate with adequate hygiene and grooming. (*Id*). Plaintiff's thought processes were coherent and goal-directed with no evidence of hallucinations, delusions or paranoia in the evaluation setting. (*Id*.). She expressed moderately to markedly dysphoric and tense affect during the evaluation. (*Id*.). Dr. Ransom noted that Plaintiff's attention and concentration were moderately impaired. (*Id*.). She could count backwards from ten, and do two out of three simple calculations. (*Id*.). She had difficulty with serial threes. (*Id*.). Plaintiff's attention and concentration appeared to be impaired by depression and anxiety. (*Id*.). Her intellectual functioning appeared to be average. (*Id*.).

Dr. Ransom assessed that:

> This individual will have moderate difficulty following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration for simple tasks, maintaining a simple regular schedule and learning simple new tasks. She would have moderate to marked difficulty performing complex tasks, relating adequately with others and appropriately dealing with stress. Areas of difficulty are secondary to major depressive disorder, currently moderate to marked; generalized anxiety disorder, currently moderate to marked; panic disorder with agoraphobia, currently moderate. The results of the evaluation are consistent with the claimant's allegations.

(Tr. 261-62). Dr. Ransom recommended that Plaintiff continue current intensive psychiatric treatment. (Tr. 262).

## 2.    Doctor of Osteopathic Medicine Donna Miller

On December 19, 2012, State agency consultant Donna Miller, D.O., ("Dr. Miller") completed an internal medicine examination of Plaintiff. (Tr. 254-58). Plaintiff reported her medical problems, including that she was diagnosed with asthma in 1999

which is triggered by humidity, and that she has a history of migraine headaches triggered by stress. (Tr. 254). Dr. Miller noted Plaintiff's medical history, current medications, and activities of daily living. (Tr. 254-55).

Dr. Miller's full medical examination diagnosed the following: Migraine headaches; Asthma; Obesity, status post gastric bypass surgery; and remote history of pulmonary embolism. (Tr. 257). Dr. Miller also stated that Plaintiff "should avoid any dust, irritants, or tobacco exposure which may exacerbate her asthma." (*Id.*).

## III. The Commissioner's Decision Regarding Disability

### A. Determining Disability Under the Social Security Act

For both Social Security Insurance and Disability Insurance Benefits, the Social Security Act provides that a claimant will be deemed disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin*, No. 13-CV-638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The burden is on the claimant to demonstrate that he is disabled within the meaning of the Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002). The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous

work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination of disability at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The five steps are as follows:

1.    The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3.    If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.    If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.    If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

### B.    Summary of the ALJ's Decision

In applying the five-step sequential evaluation in this matter, ALJ Withum made the following determinations. First, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through February 21, 2012. (Tr. 26). At step one

of the evaluation, the ALJ found that Plaintiff had "not engaged in substantial gainful activity since February 21, 2012, the alleged onset date." (*Id.*).

At step two, the ALJ found that Plaintiff suffered from severe impairments, including: migraine headaches, asthma, obesity, pulmonary embolism, major depression, generalized anxiety, and panic disorder. (*Id.*).

At step three, the ALJ found that none of the Plaintiff's severe impairments, alone or in combination, qualified as an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 26-27).

In making the step three evaluation, the ALJ first considered whether the "paragraph B" criteria was satisfied, determining whether Plaintiff's mental impairments result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 27). In finding paragraph B criteria restrictions, ALJ Withum gave "great weight" to Dr. Ransom's opinion. (*Id.*). ALJ Withum noted the consultative examiner's opinion was "supported by the internal mental status examination and [was] consistent with the subsequent outpatient records in the file, namely, treatment with psychotropic medications and psychotherapy with a few signs of psychiatric illness. . . ." (*Id.*). The ALJ found that the Plaintiff had mild restriction in activities of daily living. (*Id.*). The ALJ found that the Plaintiff had moderate difficulties in social functioning. (*Id.*). With regard to concentration, persistence, or pace, the ALJ found that the Plaintiff had moderate difficulties. (*Id.*). The ALJ found that the claimant has experienced no

- 19 -

episodes of decompensation which have been of extended duration. (*Id.*). Because the claimant's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the ALJ found that the "paragraph B" criteria was not satisfied. (*Id.*). ALJ Withum also found that the evidence failed to establish the presence of the "paragraph C" criteria. (*Id.*).

Because Plaintiff's severe impairments failed to meet the standards of a listing under Appendix 1, ALJ Withum assessed Plaintiff's RFC in step four of the sequential analysis. (Tr. 28-31). The ALJ found that Plaintiff:

> [H]as the residual functional capacity to perform light work . . . except never climb ladders, ropes, or scaffolds; occasionally crouch, kneel, and crawl; avoid concentrated exposure to humidity and excessive noise; avoid concentrated exposure to environmental irritants, such as fumes, odors, dusts and gases; avoid all unprotected heights; work is limited to simple, routine, repetitive tasks; no interaction with the public; occasional interaction with supervisors and coworkers.

(Tr. 28). In making her RFC determination, the ALJ followed a two-step process. (*Id.*). First, the ALJ "determined whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms." (*Id.*). Then, the ALJ evaluated the "intensity, persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit [Plaintiff's] functioning," and made findings of credibility "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms [were] not sustained by objective medical evidence . . . ." (*Id.*).

At step one, ALJ Withum found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 29). However, at step two, she found that the statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (*Id.*).

ALJ Withum first noted that Plaintiff worked consistently to the alleged onset date, before leaving her job and attempting cosmetology school. (*Id.*). Plaintiff sought disability for problems that had been treated mostly by King, a nurse practitioner, "who managed her medications and was not competent to assess psychiatric signs of illness—simply recording subjective complaints as reported and diagnosing and prescribing medications without diagnostic criteria evaluated through clinical testing." (*Id.*). The ALJ stated that "[f]or those reasons and the lack of support in outpatient records, for mental and physical impairments, no listings are met and less than sedentary is not warranted." (*Id.*).

ALJ Withum did not find that the medical evidence supported listing 12.04 "because the file does not contain medical signs of psychiatric illness to support the severity requirements in the listing." (*Id.*). The ALJ stated that factors of Plaintiff's testimony created "more [of a] situational picture than structural, in terms of mental illness." (*Id.*). The ALJ noted that despite having an inpatient stay for five days, a few nights of observation in the emergency room, and other stressors on the record, Plaintiff admitted that she was scheduled to meet with a therapist. (*Id.*). And, from the onset date of disability, Plaintiff did not routinely see a specialist, instead checking in with King once every three weeks. (*Id.*).

ALJ Withum gave little weight to King's "checkbox" evaluation because (1) King only managed Plaintiff's medications; (2) the statement was inconsistent with the state agency evaluator's opinion; and (3) the outpatient records did not support the limitations King listed. (*Id.*). The ALJ stated that the evaluation that identifies "patient's signs and symptoms" is unaccompanied by a mental status examination identifying King's observations. (*Id.*).

The ALJ indicated that King narrated subjective complaints and medical history, but did not evaluate Plaintiff using clinical testing except for four occasions in late 2012, and "even then her descriptions were conclusory based on complaints, noting only affect and mood." (Tr. 30). The ALJ found no corroboration of evidence of "the 'weeks of isolation,' not getting out of bed, and staying inside the house." (Tr. 30 n.6). Unlike King's reports, Dr. Ransom's report evaluated Plaintiff using clinical tests. (Tr. 30). Although Dr. Ransom noted limitations and signs of depressive disorder, the ALJ discounted her evaluation because it "was a one-time interview, and the totality of the record d[id] not suggest that those signs represent overall functioning." (*Id.*).

ALJ Withum noted other credibility issues in the record. (Tr. 30 n.6). When she was admitted to the emergency room in March 2014, Plaintiff reported taking eighty butalbital pills, yet urinalysis and blood work did not conform to this amount of medication. (*Id.*; *see, e.g.*, Tr. 368). The ALJ stated "[c]uriously, the timing of this emergency visit correlates with her Notice of Hearing, dated April 29, 2014." (Tr. 30 n.6). Moreover, the medical record stated it was "[u]nclear if [Plaintiff] actually took any medication or [] just stat[ed] this to get attention." (*Id.*; *see, e.g.*, Tr. 323).

In terms of asthma and obesity, ALJ Withum gave great weight to internal medicine examiner Dr. Donna Miller, who concluded "[Plaintiff] should avoid any dust, irritants, or tobacco exposure which may exacerbate her asthma." (Tr. 30).

The ALJ noted that Plaintiff continued home exercises for her knee after unsuccessful physical therapy, reporting "significant improvement in her knee." (*Id*; *see, e.g.*, Tr. 401).

With respect to migraines, ALJ Withum stated that Plaintiff "had no neurological defects and uses Zonegran." (Tr. 30). Additionally, the ALJ found that the medical record did "not prove [Plaintiff's] allegations of frequency and intensity of her headaches. . . ." (*Id.*).

ALJ Withum's summarized Plaintiff's RFC:

> [C]onsidering the knee meniscus tear, asthma, and migraines, light work is supported with never climb ladders, ropes, or scaffolds; occasionally crouch, kneel, and crawl; avoid all unprotected heights. To account for the internal medicine examiner opinion and sustained treatment for asthma and moderate obstruction on testing, she should avoid concentrated exposure to humidity and excessive noise; avoid concentrated exposure to environmental irritants, such as fumes, odors, dusts and gases; avoid all unprotected heights. Considering her sustained treatment for mental health with her nurse, taking medications and starting therapy, with some deference to subjective complaints regarding social functioning, and giving great weight to the psychiatric consultative examiner, work is limited to simple, routine, repetitive tasks; no interaction with the public; occasional interaction with supervisors and coworkers.

(Tr. 30-31).

At step four, ALJ Withum determined that Plaintiff was unable to perform any past relevant work based on Plaintiff's RFC. (Tr. 31).

At step five, ALJ Withum concluded there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 31-32). Plaintiff could perform requirements of occupations at the light exertional level, such as cleaner hospital, produce sorter, and mail clerk. (Tr. 32). Additionally, Plaintiff could perform requirements of occupations at the sedentary level, such as charge account clerk, document preparer, and call operator. (*Id.*). The ALJ concluded Plaintiff was not disabled. (Tr. 33).

## IV. Discussion

Plaintiff argues that the ALJ erred, requiring remand. First, Plaintiff argues that the ALJ's RFC finding is unsupported by substantial evidence and is inconsistent with the legal standards. (Dkt. 9 at 13). Specifically, Plaintiff asserts that the ALJ improperly rejected King's opinion, improperly incorporated Dr. Ransom's and Dr. Miller's opinion, and failed to accommodate for Plaintiff's headache limitations. (*Id.* at 13-26). Second, Plaintiff claims the ALJ's decision failed to use the appropriate legal standard in assessing Plaintiff's credibility. (*Id.* at 26-30).

### A. Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, a court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Rehr v. Barnhart*, 431 F. Supp. 2d 312, 317 (E.D.N.Y. 2006) (quoting 42 U.S.C. § 405(g)). The Social Security Act directs the

Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating Plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (stating that a reviewing Court does not examine a benefits case *de novo*). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

**B.** **The ALJ's RFC Determination Regarding Stress and Migraine Limitations is Not Supported by Substantial Evidence**

An ALJ is required to consider every medical opinion received by the Social Security Administration, and to review all available evidence. 20 C.F.R. § 404.15278(c); *Whipple v. Astrue*, 479 F. App'x 367, 370 (2d Cir. 2012). An ALJ must weigh certain factors in evaluating both treating and non-treating source statements, including the nature, length, and extent of the treating or examining relationship, as well as whether the medical opinion is supported by, and consistent with, medical signs and laboratory findings. 20 C.F.R. § 404.1527(c). An ALJ "is not permitted to substitute his own expertise or view of the medical proof . . . for any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

Remand is required when an ALJ fails to adequately evaluate the weight of a medical opinion in light of the factors set forth in 20 C.F.R. § 404.1527(c). *See, e.g.*, *Evans v. Colvin*, No 15-2569-CV, 2016 WL 2909358, at *3 (2d Cir. May 19, 2016); *Lesterhuis v. Colvin*, 805 F.3d 83, 88 (2d Cir. 2015). "Such an error . . . requires remand to the ALJ for consideration of the improperly excluded evidence, at least where the unconsidered evidence is significantly more favorable to the claimant than the evidence considered." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010); *see, e.g.*, *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).

**1.** **The RFC Does Not Account for the Stress Limitations Found by Dr. Ransom**

Plaintiff argues that it is unclear how Dr. Ransom's finding that Plaintiff had "moderate-to-marked difficulty . . . appropriately dealing with stress" is reflected in the

RFC finding. (Dkt. 9-1 at 22-24). The Commissioner argues that because the ALJ limited Plaintiff "to simple, routine, repetitive tasks with no interaction with the public and only occasional interaction with supervisors and coworkers . . . [t]his addressed Plaintiff's difficulty dealing with stressful situations." (Dkt. 14-1 at 18).

"Because stress is 'highly individualized,' mentally impaired individuals 'may have difficulty meeting the requirements of even so-called 'low-stress[] jobs,' and the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his [or her] ability to work." *Collins v. Colvin*, Case # 15-CV-423-FPG, 2016 WL 5529424, at *3 (W.D.N.Y. Sep. 30, 2016) (quoting *Stadler v. Barnhart*, 464 F. Supp. 2d 183, 188-89 (W.D.N.Y. 2006)). "Although a particular job may appear to involve little stress, it may, in fact, be stressful and beyond the capabilities of an individual with particular mental impairments." *Welch v. Chater*, 923 F. Supp. 17, 21 (W.D.N.Y. 1996). Thus, "[a]n ALJ is required to specifically inquire into and analyze a claimant's ability to manage stress." *Collins*, 2016 WL 5529424, at *3 (citing *Haymond v. Colvin*, No. 1:11-CV-0631 (MAT), 2014 WL 2048172, at *9 (W.D.N.Y. May 19, 2014)). An ALJ's failure to explain or account for stress limitations in the RFC—particularly when opined by an acceptable medical source given great weight—is an error that requires remand. *Booker v. Colvin*, No. 14-CV-407S, 2015 WL 4603958, at *3 (W.D.N.Y. July 30, 2015) (citing *Lomax v. Comm'r of Soc. Sec.*, No. 09-CV-1451, 2011 WL 2359360, at *3 (E.D.N.Y. June 6, 2011)).

Here, Dr. Ransom opined that Plaintiff exhibited "moderate to marked difficulty performing complex tasks, relating adequately with others[,] and appropriately dealing with stress." (Tr. 261-62). Although ALJ Withum acknowledges this in her decision, (*see* Tr. 27), the ALJ did not expressly discuss how Plaintiff's stress limitations were incorporated into the ALJ's RFC finding. The RFC assessment, including limiting Plaintiff to "simple, routine, repetitive tasks; no interaction with the public; occasional interaction with supervisors and coworkers," neither addresses nor expressly accounts for Plaintiff's specific stress limitations as set out by Dr. Ransom and given great weight by the ALJ. Additionally, the record indicates Plaintiff has "a history of anxiety and panic disorder." (Tr. 419). This too may affect her ability to work in a stressful environment.

ALJ Withum also neglected to factor Dr. Ransom's analysis of Plaintiff's stress into the RFC determination. "It is plainly improper for an ALJ to cherry-pick evidence that supports a finding of not-disabled while ignoring other evidence favorable to the disability claimant." *Starzynski v. Colvin*, No. 1:15-cv-00940(MAT), 2016 WL 6956404, at *3 (W.D.N.Y. Nov. 29, 2016) (citing *Trumpower v. Colvin*, No. 6:13-cv-6661 (MAT), 2015 WL 162992, at *16 (W.D.N.Y. Jan. 13, 2015)). The Commissioner must address the totality of a medical opinion to which it assigns great weight. *Pike v. Colvin*, No. 14-CV-159-JTC, 2015 WL 1280484, at *7 (W.D.N.Y. Mar. 18, 2015) (holding that an ALJ's "cherry-pick[ing]" of evidence by disregarding certain restrictions was an inconsistent use of a doctor's opinion, insufficient to support a RFC assessment, warranting remand). Although ALJ Withum gave great weight to Dr. Ransom's opinion, and limited Plaintiff's tasks and interaction with others, the limitations do not account for the factors

influencing Plaintiff's ability to handle stress at work. Thus, the RFC finding was not supported by substantial evidence, and remand is required. *See, e.g., Perry v. Colvin*, No. 1:14-CV-01028(MAT), 2016 WL 241364, at *3 (W.D.N.Y. Jan. 21, 2016) ("[O]n remand, the ALJ should fully consider the functional limitations assessed by plaintiff's consulting physicians, stating the weight given to each opinion including whether portions of any opinion were rejected, and explain the specific evidence supporting any assessed limitations in the ultimate RFC determination.").

### 2. The ALJ Failed to Provide Sufficient Reasoning for Discounting King's Opinion

Plaintiff also argues that the ALJ improperly discounted King's opinion. (Dkt. 9-1 at 14-22). "Only 'acceptable medical sources' can be considered treating sources whose medical opinions may be entitled to controlling weight." *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (quoting SSR 06-03p). The Second Circuit has repeatedly held that nurse practitioners do not command the same weight as a treating physician or other acceptable medical source. *See Monette v. Colvin*, 654 F. App'x 516, 518 (2d Cir. 2016); *Akey v. Astrue*, 467 F. App'x 15, 17 (2d Cir. 2012); *Genier*, 298 F. App'x at 108. Opinions from nurse practitioners are not considered "acceptable medical sources," rather, they are defined as "'other medical sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." *Genier*, 298 F. App'x at 108 (citing 20 C.F.R. § 416.913(d)(1)). "The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." SSR 06-03p.

"[I]t may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." *Id.*

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners . . . have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

*Id..*

Here, ALJ Withum explicitly identified three reasons for giving little weight to King's opinion (*see* Tr. 446-48): (1) King only managed Plaintiff's medications; (2) King's statements were inconsistent with the Dr. Ransom's opinion; and (3) the medical records did not support King's limitation findings. (Tr. 29). ALJ Withum also noted that King "was not competent to assess psychiatric signs of illness—simply recording subjective complaints as reported and diagnosing and prescribing medications without diagnostic criteria evaluated through clinical testing." (*Id.*).

It was improper for the ALJ to discount Nurse King because she recorded Plaintiff's subjective complaints. "[A] plaintiff's application for disability cannot be rejected simply because it is based on subjective complaints." *Nix v. Astrue*, No. 07-CV-344, 2009 WL 3429616, at *9 (W.D.N.Y. Oct. 22, 2009). Thus, it was error for the ALJ to disregard King's opinion because she recorded subjective complaints.

Under the SSD regulations, a nurse practitioner does not necessarily need to receive the same weight as an acceptable medical source. ALJ Withum noted that King was "not competent to assess signs of psychiatric illness." (Tr. 29). However, the ALJ considered that "[King] has consistently met with . . . [Plaintiff] for a substantial length of time." (Tr. 29 n.2). A substantial length of treatment can support affording more weight to a non-acceptable medical source. SSR 06-03p. Therefore, on remand, ALJ Withum should clarify her reasoning behind discounting King's opinion.

It is unclear how King's reports are inconsistent with Dr. Ransom's opinions. The ALJ noted with respect to Dr. Ransom's opinion:

> There were signs of depressive disorder: motor behavior lethargic, eye contact downcast, speech slow and halting, dysphoric and tense speech, dysphoric affect. However, this was a one-time interview, and the totality of the record does not suggest that those signs represent overall functioning.

(Tr. 30). ALJ Withum then added that Dr. Ransom interpreted her tests as showing "moderate limitations in concentration and attention and in recent and remote memory." (Tr. 30). King also found that Plaintiff had "difficulty thinking and concentrating." (Tr. 446). Simply put, the ALJ failed to elucidate any inconsistencies between King's opinion and that of Dr. Ransom.

Additionally, the ALJ failed to describe how King's opinion differed from the medical record. The ALJ does not elaborate upon any facts suggesting that the limitations documented by King are unsupported by outpatient records, except in a footnote stating that Kane did not corroborate "'weeks of isolation', not getting out of bed, and staying inside the house." (*See* Tr. 30 n.6). However, Kane did indicate

Plaintiff reported panic attacks 3-4 times a week, fear of crowds, nausea and vomiting. (Tr. 416.) Kane also indicated "[Plaintiff] isolates herself and avoids leaving the house," and that "[Plaintiff] states she is anxious all the time." (*Id.*). He also noted that Plaintiff's mood was predominantly anxious, and his preliminary diagnosis included: Panic Disorder with Agoraphobia; Generalized Anxiety Disorder; Depressive Disorder NOS; R/O Bipolar II Disorder; and R/O PTSD. (Tr. 417). Additionally, Dr. Yu, in conjunction with King, noted that Plaintiff had panic attacks, difficulty leaving her house, and "a history of anxiety and panic disorder." (Tr. 418-19). Dr. Ransom, whose opinion was given great weight by the ALJ, diagnosed "Panic disorder with agoraphobia, currently moderate" and noted Plaintiff "rarely socializes with anyone." (Tr. 261-62). On remand, the ALJ should explain the inconsistencies between King's opinion and the outpatient medical records.

### 3.    Plaintiff's Headache Limitations Require Clarification

Plaintiff argues that the ALJ failed to accommodate for limitations relating to Plaintiff's migraines. (Dkt. 9-1 at 25). It is unclear how limiting Plaintiff to "light work . . . supported with never climb ladders, ropes, or scaffolds; occasionally crouch kneel, and crawl; avoid all unprotected heights" relates to Plaintiff's migraines. Additionally, Dr. Kingston noted that "stress and depression may be contributors to her headaches," (Tr. 227), and the ALJ failed to properly account for Plaintiff's specific stress limitations. Thus, on remand, the ALJ's finding with respect to Plaintiff's headaches requires clarification. *See, e.g., Perry*, 2016 WL 241364, at *3.

### 4.  Dr. Miller

Plaintiff argues that the ALJ failed to explain any basis for an RFC finding showing the ability to perform a range of light work with environmental limitations, considering that Dr. Miller assessed "[Plaintiff] should avoid any dust, irritants, or tobacco exposure which may exacerbate her asthma." (Dkt. 9-1 at 24 (citing Tr. 257)). The Court disagrees.

ALJ Withum noted that upon physical examination at the hospital in 2014, Plaintiff's "lungs were clear, breath sounds normal, with no respiratory distress." (Tr. 30 (citing Tr. 305)). She also noted that in 2012, a pulmonary function test showed moderate obstruction. (Tr. 30 (citing Tr. 242-245)). Additionally, ALJ Withum considered Plaintiff's testimony, in which Plaintiff responded that her asthma is controlled "for the most part" if she uses her inhalers, but her asthma can be affected by seasonal allergies and humidity. (Tr. 30, 61). Dr. Miller concluded "[Plaintiff] should avoid any dust, irritants, or tobacco exposure which may exacerbate her asthma," to which the ALJ gave "great weight." (Tr. 30 (citing Tr. 257)).

The ALJ's conclusion is consistent with the medical record and supported by substantial evidence. The ALJ gave great weight to Dr. Miller's opinion, and similarly found that Plaintiff should "avoid concentrated exposure to environmental irritants, such as fumes, odors, dusts, and gases." (Tr. 31). Moreover, ALJ Withum accounted for Plaintiff's testimony in finding that Plaintiff "should avoid concentrated exposure to humidity and excessive noise." (Tr. 30-31).

Plaintiff cites to *Holste v. Colvin*, Case # 15-CV-582-FPG, 2016 WL 3945814 (W.D.N.Y. July 16, 2016), in arguing that the ALJ's RFC finding is unsupported because there was no explanation for the finding of "concentrated exposure." (Dkt. 9-1 at 24-25). However, in *Holste*, there was no medical source opinion to support the ALJ's RFC finding; rather, the ALJ made a "common sense judgement about functional capacity." *Holste*, 2016 WL 3945814, at *4. Here, in contrast, ALJ Withum relied on, and gave great weight to, Dr. Miller's expert opinion. Thus, as to this issue, the ALJ's finding was supported by substantial evidence.

### C.    Credibility

Because remand is required, the Court does not address Plaintiff's alternate argument regarding the ALJ's credibility analysis.

### CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 14) is denied, Plaintiff's motion for judgment on the pleadings (Dkt. 9) is granted in part, and this matter is remanded for further administrative proceedings consistent with this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: July 31, 2017
     Rochester, New York